IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| ANTHONY D. MOORE,        ) | |
| )  | |
| Plaintiff,        ) | |
| )  | |
| v.        ) | Case No.    1:04cv0087 |
| )  | |
| MICHAEL J. ASTRUE, Commissioner of        ) | Judge Thomas A. Wiseman, Jr. |
| Social Security,[1]        ) | |
| )  | |
| Defendant.        ) | |

**MEMORANDUM OPINION**

Before the Court is Plaintiff Anthony D. Moore's motion for judgment on the administrative record (Doc. No. 15), seeking judicial review of the Commissioner's denial of his claim for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Commissioner of Social Security ("Commissioner" or "Defendant") has filed a response opposing Plaintiff's motion (Doc. No. 19) and Plaintiff has filed a reply brief (Doc. No. 26).

Upon review of the Administrative Record as a whole (Doc. No. 5, Attachment; hereafter, "AR"), the Court finds that the Commissioner's determination at step five of the sequential analysis that Plaintiff is able to perform work that exists in the national economy is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g). As set forth below, remand is required for reconsideration of that issue.

**I.    INTRODUCTION**

Plaintiff protectively filed his current applications for DIB and SSI on May 22, 2000, alleging disability commencing December 3, 2001[2] due to shortness of breath; inability to sleep at night; fatigue; back, leg, neck and hip problems; migraine headaches; constant chest pain; and dizziness. (AR 17, 107–10, 144, 180, 198–200.)  After Plaintiff's applications were denied initially and upon reconsideration, Plaintiff requested and received a hearing, at which he was represented by an attorney. (AR 33, 37–87,

---

[1]Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

[2]Plaintiff originally alleged a disability onset date of July 1, 1997, which he amended at his hearing to December 3, 2001. (AR 39.)

90–94, 189–97.) The hearing was conducted on April 8, 2003 before Administrative Law Judge ("ALJ") Donald Garrison in Nashville, Tennessee. (See AR 37–73.) The ALJ issued a written decision denying Plaintiff's applications on September 26, 2003. (AR 14–21.) The Appeals Council denied Plaintiff's request for review by letter dated July 13, 2004 (AR 4–7), thereby rendering the ALJ's decision the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II. FACTUAL BACKGROUND

Plaintiff was born February 18, 1965 and was thirty-eight years old at the time of the ALJ's decision. (AR 17.) He has no more than an eighth-grade education, is functionally illiterate, and has had no other training. (AR 17.) His past relevant work includes that of painter, asbestos remover, lumber puller, and bowling alley machine operator. (AR 156, 186.) He was involved in a car accident in 1997. Afterwards, he returned to work doing asbestos removal but apparently missed more days than he worked and was told he was no longer needed. (AR 53–54, 180.) For purposes of DIB, he must prove that he was disabled between the time of the alleged onset of disability, December 3, 2001, and his date last insured, December 31, 2001. For SSI purposes, he must demonstrate he was disabled between the alleged onset date and the date of the ALJ's decision.

### A. The Medical Evidence

Plaintiff's medical records, including some Emergency Room reports going back to 1995, document a long history of repeated episodes of bronchitis, chronic sinus problems, occasional headaches and chest pain, sleep apnea, gastric pain, and low back pain. (*See, e.g.*, AR 214–35.)

He was treated by a Dr. Mangubat at the Family Health Group in Waynesboro, Tennessee from October 1999 through July 2000. (AR 268–80.) He presented at his doctor's office approximately monthly during that time frame. He complained consistently of a productive cough and congested sinuses, headaches, chest pressure and high blood pressure. When his blood pressure was controlled, however, his headaches improved. He was noted to be a long-term smoker, having smoked more than a pack a day for nearly twenty years. He finally had surgery in May 2000 to correct a deviated septum, remove nasal polyps and generally clear sinus obstruction. (AR 251–53.) A chest x-ray taken at around the same time showed his lungs to be "clear and well expanded." (AR 263.)

After his sinus surgery in May 2000, a Dr. Mallick noted that a home study to determine whether he had sleep apnea and would possibly be a good candidate for use of a C-pap machine now that his sinuses should be cleared up. (AR 268.) The plan was to arrange for a sleep study and stress test. (AR 280.)

Around the same time, results from a back x-ray showed some disc space narrowing at L5-S1 and possible mild disc space narrowing at L4-5, but it was an "[e]ssentially negative exam with no evidence of significant plaque (in arterial system) or stenosis." (AR 323.)

A stress test was performed on July 6, 2000 which he tolerated well. (AR 278.) (Test results at AR 299–317.)

On July 24, 2000, Dr. Darrel R. Rinehart performed a consultative examination of the Plaintiff, whose chief complaint at that time was chest pain lasting for several months, sometimes associated with radiating pain and shortness of breath. He also complained of low back pain that "comes and goes," shortness of breath in particular upon exertion, a history of either bronchitis or pneumonia at least once a year, headaches (which he noted were better now that his blood pressure was better controlled), and a history of recent sinus surgery. He reported being on Adalat, Monopril, Rhinocourt, and Nasonex. On physical examination he was noted to have normal range of motion in all joints and "completely clear" lungs. He could bend over and touch his toes and had no limitations in muscle strength or reflexes. However, Dr. Rinehart had him undergo an EKG which indicated Plaintiff was at that very time in the process of having a myocardial infarction. The doctor did not review the EKG report until after Plaintiff had left the office, but he immediately contacted him to tell him to go to the ER or to see his family doctor that same day. (AR 329–31.)

At the hospital it was confirmed that Plaintiff was having an acute myocardial infarction. He underwent a left heart catheterization and placement of a stent in the distal right coronary artery. There were no complications with the procedure and he was discharged after three days with instructions to follow a low-cholesterol and low-saturated fat diet. (AR 332–33.)

Plaintiff was treated by Dr. Veena Anand at the Anand Clinic in September and October 2000. (AR 349–62.) Her diagnosis at the time included gastrointestinal reflux disease, hyperlipidemia, and hypertension. There was still a question of whether he had sleep apnea, and he continued to complain about a constant cough, chest pain, inability to sleep much, increased weakness and fatigue, and

congested sinuses. A pulmonary function test taken in September showed "mild chest restriction." (AR 359.) A chest x-ray on the same day showed a "hypoinflated chest" with a calcified granuloma in the lower left chest. An abdominal ultrasound taken in October was unremarkable, as was a gallbladder ultrasound. Dr. Anand did not return the requested "Medical Source Statement of Ability to Do Work-Related Activities."

Plaintiff was treated by a Dr. Charles Moore in November and December 2000. (AR 377–82.) In November Plaintiff continued to complain of chest pain of three-to-four week duration, headaches, hypertension, low back pain, headaches down the right side of his head into his neck mostly in the evenings. In December he denied weakness, fatigue, dyspnea or chest pain. An EKG conducted at that time was basically within normal limits with no "acute ischemic changes . . . noted." (AR 382.)

Plaintiff underwent a cardiac catheterization on December 8, 2000 in response to his repeated complaints about chest pain. (AR 389–90.) The findings included "[n]o hemodynamically significant obstructive coronary artery disease"; the stented segment was "widely patent"; and there was "minimal LV dysfunction." The doctor performing the test therefore concluded that Plaintiff's chest discomfort "appear[ed] to be non-cardiac." (AR 390.)

Plaintiff was treated by a Dr. Delaplane from approximately February 2001 through October 2001. (AR 410–25.) Dr. Delaplane's handwritten treatment notes are difficult to read but it appears Plaintiff saw him approximately monthly for refills on medications, and continued to complain about the same symptoms: headaches, high blood pressure, sleep apnea, reflux disease, back pain, and sinus congestion. An MRI conducted on March 6, 2001 revealed "degenerative changes (at L-3/4 and L-4/5) with mild spinal stenosis at L-4/5" (AR 419), and some dessication involving discs at C3 through 5 (AR 425). A chest study performed on March 20, 2001 showed "no significant stenosis or regurgitation" (AR 418).

Dr. Rinehart was asked to perform a second independent medical examination on April 16, 2001. (AR 392–95.) Dr. Rinehart noted that Plaintiff's primary complaint at that point was a "history of really mostly spinal problems, in particular neck and back pain." (AR 392.) He had been told he had degenerative disc disease and was to be fitted with TENS unit. He claimed that pain in his neck and back limited his ability to bend and lift, that he could sit only twenty or thirty minutes at a time and stand a little longer than that. He could walk about one block but his right leg had a tendency to give way. He claimed

the medication he took helped the pain "some." (AR 392) Dr. Rinehart recalled that during his first examination, Plaintiff was determined to be in the process of having a myocardial infarction. During the second examination, Plaintiff reported no chest pain or palpitations but lots of headaches, mostly in the evening. He claimed he had sleep apnea and some shortness of breath, especially upon exertion, which limited him somewhat. The medications he was on included Lortab, Protonix, Soma, Monopril, Atenolol, Imdur, Nitroquick, Zocor, and Aspirin.

The physical exam, however, was basically unremarkable except that forward flexion was limited to 75-80 degrees, and Plaintiff reported some discomfort with straight leg raises to 45 degrees. A spinal x-ray taken the same day indicated early degenerative disc disease at C4-5 and some degenerative changes in the lumbar spine. (AR 395.) Dr. Rinehart assessed Plaintiff as being "able to sit, stand, lift, walk, etc. for 3–4 hours in an 8-hour workday." (AR 394.) His assessment was supposedly based on the spinal x-ray, the physical exam, and Plaintiff's medical history, as well as Plaintiff's subjective complaints of pain and limitations.

Dr. Saul Juliao performed a Residual Functional Capacity Assessment on April 30, 2001 (AR 396–403). Dr. Juliao found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours and sit about 6 hours in 8-hour workday. He found Plaintiff to be unlimited in his ability to push and pull, capable of occasional climbing ramps or stairs (but never ladder/rope/scaffolds), and occasional balancing, stooping, kneeling, crouching, and crawling. No manipulative, visual or communicative limitations were established, and only some minor environmental limitations, including to avoid concentrated exposure to extreme heat or cold, fumes and odors and vibrations. Dr. Juliao noted that he did not give Dr. Rinehart's opinion greater weight because Plaintiff's physical examination by Dr. Rinehart was unremarkable except for forward bending limited to 75-80%, slight back pain with straight leg raise to 45%, a slight limp favoring right leg, and cervical spine x-rays showed early degenerative disc disease at C4-5, and mild degenerative changes in L-S spine. Dr. Juliao felt that Dr. Rinehart's assessment was unsupported by these physical findings, which instead, he believed, justified a determination that Plaintiff had a only a partial physical impairment due to the combined effect of multiple conditions.

Plaintiff was treated by a Dr. Armetta from December 2001 through at least January 2003. (AR 426–48.) According to Dr. Armetta's treatment notes, Plaintiff continued to complain of sinus problems

for the symptoms of which over-the-counter medications were not effective. He complained of frequent headaches starting at the temple and going to the back of his head, occasional chest pain with cough, neck stiffness, insomnia, sleep apnea, and pain in his lower back, leg and back pain, occasional diarrhea, c-spine spasm, and dyspnea. There is a mention that he was on Wellbutrin but discontinued it because it caused side effects such as blurred vision and dizziness but was not helping him stop smoking. He was noted to be using a C-pap machine with oxygen but still reported difficulty sleeping. In April 2002, he reported that he had used his nitroglycerin on occasion. A chest x-ray in the fall of 2002 indicated "possible obstructive pulmonary disease," and Dr. Armetta assessed him as having an upper respiratory infection/chronic obstructive pulmonary disease as of October 2002. (AR 428.) His diagnoses as of November 2002 included severe sinusitis, chronic obstructive pulmonary disease, chronic gastritis, hyperlipidemia, degenerative disc disease of the lumbar spine, and sleep apnea. (AR 430.)

Yet another independent exam was conducted by Dr. Rinehart in May 2003. At this examination, Plaintiff reported that his chief complaint was shortness of breath for more than a year, particularly upon exertion. He nonetheless continued to smoke. He claimed he could not walk as much as a block. He also slept on three pillows at night, waking up frequently despite the use of a nasal C-pap and oxygen at night for his sleep apnea. He also reported back pain, for which medication helped some. He described occasional chest pain, stress related. Dr. Rinehart also noted he had a history of coronary artery disease and a myocardial infarction in the past. His physical exam was unremarkable except that he only had "about 75 degrees anterior lumbosacral flexion" (AR 473), was slow getting up and down from the table and walked with a slight limp, favoring his left leg. Although his lungs were "clear to auscultation," a pulmonary function test performed that day yielded unreliable results because Plaintiff was coughing and became diaphoretic. (AR 473, 474.)

Based on Plaintiff's complaints of shortness of breath and low back pain, Dr. Rinehart opined that Plaintiff could sit, stand, and walk "intermittently for probably 4-6 hours in an 8-hour workday," and lift 20-25 pounds intermittently over the same period of time. (AR 471–73.)

Donita Keown, M.D., performed an IME on June 17, 2003[3] (AR 454–58); she also had a pulmonary function test done and filled out an assessment regarding Plaintiff's ability to do work-related

---

[3] This date occurs after his last insured date of December 31, 2001 for purposes of his DIB claim. The evidence is still relevant to his SSI claim.

activities. (AR 459–67.) Dr. Keown noted Plaintiff's primary complaint was shortness of breath of about a year's duration, which he attributed to sleep apnea or smoking. (He claimed to have stopped smoking seven days before the exam.) He explained that he used a C-pap machine which helped him sleep some but he still felt fatigued most of the time. He was prescribed oxygen for use at night with the C-pap, but he also used it occasionally during the day if he was short of breath. He claimed to sleep four to five hours per night.

Dr. Keown noted Plaintiff had a history of coronary artery disease with stent placement in July 2000, but that the record indicated a negative stress test as recently as December 2002. Plaintiff nonetheless reported he used nitroglycerin on occasion and Isosorbide Mononitrate daily. His past medical history included childhood asthma, hypertension, chronic bronchitis, sleep apnea, coronary artery disease, hyperlipidemia, surgery for stent placement, splenectomy at age 16, appendectomy in remote past, sinus surgery. His current medications included Nasacort, Advair, Albuterol, Atenolol, Monopril, Isosorbide Mononitrate, Zocor, aspirin, sublingual nitroglycerin spray, Skelaxin, Temazepam, Paxil, and Aciphex. His subjective symptoms included chest pain, shortness of breath on exertion, neck and back pain, occasional heartburn. (AR 455–57.)

On physical examination, Dr. Keown found that Plaintiff was ambulatory without a limp and was not overtly out of breath at any time during the exam; he had full strength in all muscle groups and full range of motion in all joints. She noted he complained of pain with dorsiflexion at 80 degrees but otherwise there were no objective findings, including no spasms or trigger points. His lung fields appeared clear. A pulmonary function test performed at her request, however, indicated mild to moderate restriction. (AR 463–67.)

Based on her physical assessment, Dr. Keown found Plaintiff had no limitations associated with lifting/carrying, standing/walking, sitting, pushing/pulling; some postural limitations including limiting climbing, kneeling, crouching etc. only occasionally; and no limitations with balancing. She recommended only occasional climbing, crouching, kneeling and stooping.

### B. Testimony at the Hearing – Plaintiff and His Wife

At the hearing, Plaintiff testified that he was not seeing any medical specialists and that he had been told to quit smoking but had not yet succeeded in doing so, though he was down from a pack to a half-pack per day. (AR 43, 45, 51.) He testified that he used oxygen mostly at night for his sleep apnea

but occasionally used it during the day, including on the day of the hearing, because he gets out of breath if he has to do a lot of walking (AR 44). He also uses a C-pap machine for his sleep apnea. With respect to his other physical ailments, he testified he had constant back pain for which he had been told to cut back on prescription pain medication and instead use a TENS unit and ibuprofen, which caused him stomach problems. He rated his back pain at a 7 or 8 out of 10, and claimed it made it difficult for him to sit for long. He estimated he could sit for 45 minutes at a time, at most, before it bothered his back. He complained of headaches related to his high blood pressure, which also caused him to be short-winded. (AR 45.) He stated he had occasional chest pain, and that he had used nitroglycerin in connection with his chest pain approximately four times in the previous six months. (AR 51–52.) He believed the nitroglycerin exacerbated his headaches, so he only used it when absolutely necessary. (AR 52.) He also complained about chronic sinus infections.

He testified regarding his usual daily activities that he took care of his own personal needs, though his wife helped him with his shoes and socks. Otherwise he "piddles around the house," tries to help his wife by occasionally putting a load of clothes in the washer, feeding the dog, and cooking a little. He tried to mow the lawn using a riding lawnmower on the "strip in front of [his] trailer" (AR 43). He could drive short distances, watch television, accompany his wife to the grocery store, attend church on occasion, visit his father. (AR 63.) Plaintiff agreed that his back and his breathing were the main problems that prevented him from working. (*See* AR 72.)

Plaintiff's wife testified he got short of breath and used the oxygen five or six times a day. His back gave him "a lot of trouble," sometimes causing him to fall and not be able to get back up without her help. She estimated he was able to walk about one hour

### C. Testimony At the Hearing – Vocational Expert

A vocational expert ("VE"), Rebecca Williams, testified at the hearing. The ALJ asked her to assume a person of the claimant's age, education and work experience, and that such a person was limited to light work. Given such restrictions, the VE agreed this person would not be able to perform any of claimant's past relevant work. The ALJ then asked the VE to assume that such a person could not tolerate exposure to irritating inhalants or temperature extremes, that he was limited to occasional postural activities such as climbing, balancing, etc., and that he needed the option to sit or stand at will.

The ALJ asked whether, given these limitations, there was any light or sedentary work available in the Tennessee regional economy.

The VE testified that at the light level of exertion there were approximately 1,200 assembler jobs, 4,0000 machine operator jobs, and 900 inspector jobs available in the regional economy that would accommodate the restrictions identified by the ALJ. At the sedentary level, according to the VE, there were approximately 3,500 assembler jobs, 800 inspector jobs, and 1,500 jobs classified as "general laborer" at the sedentary level. She further indicated that none of the jobs she had identified required literacy. The ALJ asked her to further assume that the person was limited to lifting and carrying no more than 10 pounds occasionally and less than 10 pounds frequently. The VE testified that this further restriction would eliminate all the light jobs; however, the sedentary jobs she had identified would still be available. Further, she stated that the both the light and sedentary jobs she had initially identified would still be available if she assumed a mild loss of concentration, persistence and pace. If she assumed a moderate loss of concentration, persistence and pace, all the sedentary jobs would still be available but the number of light jobs available would be somewhat reduced. With a marked loss of concentration, persistence and pace, no jobs would be available. Likewise, if lying down during the day were medically required, no jobs would be available. Finally, she agreed that if the ALJ found the claimant to be fully credible, the claimant would be unable to do any of the jobs she had identified. (AR 69–71.)

### III. THE ALJ'S FINDINGS

In his written decision, the ALJ noted specifically that Plaintiff's "subjective allegations of disabling pain and functional limitations are not credible when they are examined under the guidelines set forth in the Social Security Regulations at 20 CFR 404.1529 and 416.929. Most specifically, they are not supported by the objective medical evidence or the acknowledged range of daily activities." (AR 18.) Based on the evidence in the record, the ALJ made the following findings:

1. The claimant met the insured status requirements of the Act as of the alleged disability onset date and through December 31, 2001.

2. The claimant has not engaged in substantial gainful activity since the alleged disability onset date.

3. The claimant has "severe" impairments including chronic obstructive pulmonary disease, sleep apnea, lumbar spinal disc disease and coronary artery disease with residuals of angioplasty/stenting surgery.

4. The claimant's impairments, considered individually and in combination, do not meet or equal the severity requirements of any impairment set forth at 20 CFR Part 404, Subpart P, Appendix One.

5. The claimant's allegations of disabling pain and functional limitations are not credible.

6. The claimant retains the residual functional capacity for sedentary work with a sit-stand option that does not require more than occasional postural activities or exposure to irritating inhalants or temperature extremes, and with moderate pain-related deficits in the ability to maintain concentration, persistence or pace.

7. The claimant cannot perform any past relevant work.

8. The claimant is a "younger individual."

9. The claimant is functionally illiterate.

10. The claimant has no transferable work skills.

11. If the claimant could perform the full range of sedentary work, considering the vocational factors of age, education and work experience, a directed conclusion of "not disabled" would result under Rule 201.25, Table One of Appendix Two to Subpart P, 20 CFR Part 404.

12. Although the claimant's nonexertional limitations preclude performance of the full range of light work [sic], using the above-cited Rule as a framework for decision making, a significant number of jobs exist in the national economy which could be performed, considering the residual functional capacity and vocational factors. Examples of such jobs include: assembler; general laborer; and machine operator.

13. The claimant has not been under a disability, within the meaning of the Social Security Act, through the date of this decision.

(AR 20.) As a result of these findings, the ALJ rejected Plaintiff's claims for DBI and SSI. (AR 21.)

## IV. DISCUSSION

### A. Standard Of Review

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. See Abbott v. Sullivan, 905 F.2d 918, 922 (6th Cir. 1990). If substantial evidence supports the ALJ's conclusion, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion. Youghiogheny & Ohio Coal Co. v. Webb, 49 F.3d 244, 246 (6th Cir. 1995). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. See Richardson v. Perales, 402 U.S. 389,

401 (1971). Substantiality is based upon the record taken as a whole. See Houston v. Sec'y of Health & Human Servs., 736 F.2d 365, 366 (6th Cir. 1984).

### B. Evaluation Of Entitlement To Social Security Benefits

Under the Social Security Act (the "Act"), Plaintiff is entitled to receive benefits only if he is deemed "disabled." 42 U.S.C. § 423(d)(1)(A). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In applying the standards for determining disability, the Secretary has promulgated regulations setting forth a five-step sequential evaluation process. See 20 C.F.R. §§ 404.1520 and 406.920. An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. See id. The Sixth Circuit has summarized the steps as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

See Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)-(f). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

### C. Claimant's Statement of Errors

Plaintiff claims that the ALJ erred as follows:

I. The ALJ's credibility finding is not based on substantial evidence.

II. The ALJ erred in discrediting the opinion of Dr. Rinehart. . . .

III. The Commissioner failed to sustain [his] burden of establishing that there is other work in the national economy that Mr. Moore can perform.[4]

(Doc. No. 15, at 1.) Each of these contentions is addressed below.

### *(1) The ALJ's Credibility Finding*

Plaintiff takes issue with the ALJ's determination that his "allegations of disabling pain and functional limitations are not credible" (AR 20), which was based on the ALJ's finding that Plaintiff's subjective allegations of disabling pain and functional limitations were not fully credible in light of the objective medical evidence and Plaintiff's acknowledged range of daily activities. (AR 18.) The Plaintiff argues generally that the ALJ's credibility finding is not based on a full and complete reading of the record, that the record contains ample objective medical evidence that supports the degree of pain reported by the Plaintiff, and that the range of daily activities in which Plaintiff stated he engaged was not inconsistent with the degree of pain he reportedly experienced.

To the contrary, the Court finds that there is substantial evidence in the record to support the ALJ's credibility determination, and that the ALJ supported his determination with references to relevant portions of the record. Further, it is clear, based upon the degree of restrictions by which the ALJ found the Plaintiff to be vocationally limited, that the ALJ did not completely discount Plaintiff's allegations of pain and functional limitations. Moreover, while a determination that Plaintiff's subjective allegations of pain were supported by the medical record would likely also have been found to be supported by substantial evidence, this Court's review is limited to a determination of whether the ALJ's decision is adequately supported. The ALJ's determination that the objective medical evidence failed to support Plaintiff's subjective complaints is amply substantiated by the record. Plaintiff's claim of error in this regard is therefore overruled.

### *(2) The Weight Given Dr. Rinehart's Opinions*

As set forth above, Dr. Rinehart, a consultative physician, examined Plaintiff three times over a two-year period, on July 24, 2000; April 16, 2001 and May 5, 2003. Dr. Rinehart opined that Plaintiff was unable to work a full eight-hour workday, and that he was instead limited to working no more than about 5 hours per day. The ALJ found that "[w]ithin the context of the multiple Medical Source Statements and

---

[4]Plaintiff initially raised a fourth argument, that the ALJ erred as a matter of law in failing to comply with the Commissioner's policies regarding obtaining post-hearing evidence. Plaintiff expressly abandoned that argument in his reply brief (Doc. No. 26).

the acknowledged range of daily activities, Dr. Rinehart's assessments of inability to sustain even sedentary work are not well supported by the evidence and are, therefore not accorded significant weight." (AR 19.) Plaintiff asserts that the ALJ's decision to disregard Dr. Rinehart's opinion is not based on substantial evidence.

While the Court agrees with Plaintiff that Plaintiff's daily activities are not necessarily inconsistent with Dr. Rinehart's opinion that Plaintiff is unable to perform sustained work activities, the Court nonetheless finds that the ALJ's decision is based on substantial evidence. As indicated above, Dr. Juliao discounted Dr. Rinehart's opinion because Plaintiff's physical examination by Dr. Rinehart was basically unremarkable except that forward bending was slightly limited (to 75-80%), and he had slight back pain with straight leg raise to 45%, a slight limp favoring right leg, and cervical spine x-rays showed early degenerative disc disease at C4-5 and mild degenerative changes in L-S spine. Dr. Juliao found that Dr. Rinehart's assessment was unsupported by these physical findings. Similarly, Dr. Keown, who performed a consultative examination approximately six weeks after Dr. Rinehart's final examination, found that Plaintiff's pulmonary function tests were only mildly abnormal, that Plaintiff was never overtly short of breath during her examination, and there was no basis for any physical functional limitations other than a need to avoid more than occasional postural activities such as stooping and crouching. The ALJ did not completely adopt Dr. Keown's opinion either, instead adopting a middle-of-the-road approach, but his decision not to accord more weight to Dr. Rinehart's opinion regarding Plaintiff's ability to work is clearly supported by substantial evidence in the record.

In any event, Dr. Rinehart's opinion regarding Plaintiff's inability to work appears to have been based primarily upon Plaintiff's subjective complaints rather than on objective medical observations. An ALJ can discount the opinion of a consulting physician where it is based primarily on subjective complaints related by the claimant. *Teverbaugh v. Comm'r of Soc. Sec.*, 248 F. Supp. 2d 702, 705 (E.D. Mich. 2003) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992)). The ALJ therefore did not err in rejecting Dr. Rinehart's opinion regarding Plaintiff's inability to work a full eight-hour workday.

### (3) Plaintiff's Ability to Perform Work Available in the National Economy

In this case, the ALJ found that Plaintiff was unable to perform any of his past relevant work. In light of that finding, the burden shifted to the Commissioner to show, by substantial evidence, that Plaintiff can perform other work that exists in the national economy. *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir.

2001). At the hearing, the ALJ elicited testimony from a vocational expert for the purpose of showing that there is a significant number of jobs in the national economy that the Plaintiff could perform. Given hypotheticals by the ALJ, the VE testified that there existed in the Tennessee regional economy sedentary jobs at the unskilled level that could be performed by an illiterate individual of Plaintiff's residual functional capacity (as determined by the ALJ), age and work experience, including 3500 assembler jobs, 800 inspector jobs and 1500 "general laborer" jobs. (AR 70.) In his written opinion, the ALJ basically accepted the VE's testimony regarding the availability of these jobs, except he mistakenly stated that there were machine operator jobs available at the sedentary unskilled level, rather than inspector jobs. The VE had testified that machine operator jobs were available at the light level of exertion.

Plaintiff argues that the ALJ erred in accepting the VE's testimony, because he failed to question the VE about whether her testimony was consistent with the DOT as required by Social Security Ruling 00-4p (Dec. 4, 2000),[5] and that this failure was not harmless error because the VE's testimony in fact conflicted with the DOT. Specifically, Plaintiff claims the DOT does not identify any unskilled sedentary jobs as an assembler, machine operator or general laborer.

In response, the Commissioner acknowledges that the ALJ apparently made a mistake when he stated the VE had identified machine operator rather than inspector jobs at the sedentary level. Otherwise, the Commissioner argues that the VE stated on the record that she was testifying consistently with the DOT (AR 40). Defendant argues that this case therefore does not implicate Social Security Ruling 00-4p, which requires the adjudicator to "inquire, on the record, as to whether or not there is . . . consistency" between the VE's occupational evidence and the DOT. In addition, although the Commissioner acknowledges that it is not clear what unskilled sedentary general laborer jobs the VE was referring to, he argues that the VE's testimony was not completely inconsistent with the DOT since the

---

[5]SSR 00-4p (Dec. 4, 2000) states in pertinent part as follows:
Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

DOT does in fact include examples of unskilled sedentary assembler and inspector jobs. (*See* Doc. No. 19, at 17 (citing as examples of unskilled sedentary assembler jobs those of atomizer assembler (706.684-030); dial-screw assembler (715.684-082; buffing turner and counter (789.687-022); lens inserter (713.687-026); and eye-dropper assembler (739.687-086); and as examples of unskilled sedentary inspector jobs those of lens-block gauger (716.687-030); film touch-up inspector (726.684-050); and cigarette and assembly machine inspector (529.666-014), among others).

The Commissioner's assertion to the contrary notwithstanding, the Court finds that the ALJ did not actually confirm whether the VE's testimony regarding the existence of jobs Plaintiff could perform was consistent with the DOT. Rather, he confirmed in a completely different context that her testimony regarding Plaintiff's past work was consistent with the DOT. (AR 40.) Likewise, the ALJ did not make a specific finding on the record that the VE's testimony was consistent with the information contained in the DOT.

In a recent unreported opinion, the Sixth Circuit adopted a "middle ground" approach to cases in which an ALJ fails to ensure that there is no conflict between the testimony elicited from a vocational expert and the DOT. *See Lancaster v. Comm'r of Soc. Sec.*, 228 Fed. Appx. 563, 574 (6th Cir. April 26, 2007). In *Lancaster*, the Court apparently rejected the holding in *Teverbaugh v. Commissioner of Social Security*, 258 F. Supp. 2d 702, 705–06 (E.D. Mich. 2003), upon which Plaintiff relies, and in which the district court found reversible error where "[i]t [was] undisputed that the ALJ failed to question the [vocational expert] regarding whether the jobs she identified as being consistent with Plaintiff's residual functional capacity [ ] conflicted with the DOT." Instead, the Sixth Circuit approved the holdings in cases in which neither the DOT nor the vocational expert's testimony was considered "per se controlling." *Id.* (citing *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000); *Boone v. Barnhart*, 353 F.3d 203, 206 (3d Cir.2003) ("While we do not adopt a general rule that an unexplained conflict between a [vocational expert's] testimony and the DOT necessarily requires reversal, we do conclude that the [vocational expert's] testimony in this case is not substantial evidence."); *Justin v. Massanari*, 20 Fed. Appx. 158, 160 (4th Cir. 2001) (finding that an ALJ is only required "to address evident discrepancies between a vocational expert's testimony and the [DOT]"); *Brown v. Barnhart*, 408 F. Supp. 2d 28, 35 (D.D.C. 2006) ("Even if SSR 00-4p places an affirmative duty on the judge, such a procedural requirement would not necessarily bestow upon a plaintiff the right of automatic remand where that duty was unmet.").

Under the facts in *Lancaster*, the Sixth Circuit ultimately found that the question of whether there were inconsistencies between the vocational expert's testimony and the DOT was not dispositive, because the hypothetical questions posed to the vocational expert by the ALJ were not consistent with the actual restrictions the ALJ ultimately determined the plaintiff had, thus rendering the vocational expert's testimony unreliable. This Court nonetheless finds the guidance provided by the *Lancaster* Court to be instructive.

Here, as in *Lancaster*, and as indicated above, the ALJ did not confirm whether the VE's testimony regarding the existence of jobs Plaintiff could perform was consistent with the DOT. Unlike the ALJ in *Lancaster*, the ALJ here also did not make a specific finding on the record that the VE's testimony was consistent with the information contained in the DOT. *Cf. Lancaster*, 228 Fed. Appx. at 574. Moreover, both parties concede that with respect to at least one of the three positions the VE identified as within Plaintiff's functional capacity the VE's testimony conflicts with the DOT. With respect to the other two types of jobs, assembler and inspector, the ALJ mis-identified one of them in his opinion, referring erroneously to machine operator jobs. In any event the VE did not identify by job code which specific jobs she intended to reference when she indicated such jobs existed in substantial numbers within the Tennessee economy. Despite the defendant's attempt to point out the existence of such jobs in the DOT, the defendant's brief does not constitute evidence. Thus, in addition to the fact that the ALJ failed to ensure that there was no conflict between the VE's testimony and the DOT, "there is no apparent means of determining whether, in fact, the jobs identified are ones that Plaintiff can perform (because the VE failed to provide the job codes)." *Teverbaugh*, 258 F. Supp. 2d at 706.

In sum, the Court finds that the VE's testimony was not demonstrated to be reliable and under the specific facts of this case does not constitute substantial evidence upon which the ALJ was entitled to rely in determining that Plaintiff could perform other work in the economy. Because the VE's testimony was the only evidence at step five on which the ALJ relied to find that the Plaintiff was not disabled, remand is required for reconsideration of the issue of whether Plaintiff is capable of performing work that exists in the national economy.

**V.    CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's decision at step five is not supported by substantial evidence. This matter will therefore be remanded for further proceedings consistent with this opinion.

An appropriate Order will enter.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge